1
2
3
4
5
6           **UNITED STATES DISTRICT COURT**
7             **DISTRICT OF NEVADA**
8
9   ALVIN RANKIN, JR.,
         *Petitioner*,                    3:09-cv-00145-LRH-VPC
10
    vs.
11                                        ORDER
12  JACK PALMER, *et al.*,
13         *Respondents*.
14
15       This habeas matter under 28 U.S.C. § 2254 comes before the Court for a final decision.
16                                    ***Background***
17       Petitioner Alvin Rankin, Jr., challenges his 2005 Nevada state conviction, pursuant to a jury
18  verdict, of one count of conspiracy to commit robbery, one count of robbery with the use of a deadly
19  weapon, and two counts of attempted robbery with the use of a deadly weapon as well as his
20  adjudication and sentencing as a habitual criminal.  He challenged his conviction in the state courts on
21  direct appeal and on state post-conviction review.
22       The summary of the trial evidence below serves as backdrop to the Court's discussion of all of
23  the claims presented, but the summary is framed in particular for the discussion of Grounds 2 and 3(c).
24       In Ground 2, petitioner alleges that he was denied rights to present a defense and to a fair trial
25  because the trial court barred the defense from establishing on cross-examination that the police had
26  not conducted gun shot residue or blood spatter testing to determine whether there was physical
27  evidence connecting Rankin to the robbery.  The state supreme court held that the trial court erred but
28  that the error was harmless.  The harmless issue is addressed on federal habeas review under the

1  standard in *Brecht v. Abramson*, 507 U.S. 619 (1993).  Under that standard, the question is whether the

2  error had substantial and injurious effect or influence in determining the jury's verdict.

3        In Ground 3(c), petitioner alleges that he was denied effective assistance of trial counsel when

4  counsel did not have his clothing tested for gunshot residue and/or blood spatter.

5        Shortly after midnight on July 3, 2004, Victor Sangines, Jesus Lera and Mario Sangines were

6  subjected to a robbery or attempted robbery by two black males in the parking area outside the

7  Sangines' apartment.  The State's theory at trial was that petitioner Alvin Rankin was the robber

8  referred to as the "second robber" during trial testimony.  The defense maintained that Rankin had been

9  mistakenly identified as one of the robbers.  There was no physical evidence linking Rankin to the

10  robbery.

11        The trial evidence tended to establish the following.[1]

12        According to Victor Sangines' testimony, the incident occurred at approximately 12:30 a.m.

13  right after he had parked his vehicle at the apartment building.  The apartment building was on Tara

14  Avenue between South Arville Street and South Valley View Boulevard, closer to the Arville end of

15  the block.  The location was in the central Las Vegas valley, approximately a mile west of the north end

16  of the Las Vegas Strip, on the other side of the interstate that divides the central valley.  The apartment

17  building was on the north side of Tara facing the street to the south, and Sangines was parking the car

18  on the north and back side of the building in a private alleyway and parking area.  Victor Sangines had

19  been driving; his brother Mario was sitting in the rear passenger seat behind him; and Jesus Lera was

20  sitting in the front passenger seat.[2]

21        As Victor Sangines was exiting from the driver's side, a man came from behind a van that was

22  parked in the next space.  As he saw the man, the "first robber," the man pulled a revolver from under

23

24      [1]The Court makes no credibility findings or other factual findings regarding the truth or falsity of evidence or

25  statements of fact in the state court.  The Court summarizes same solely as background to the issues presented in this case, and it does not summarize all such material.  No statement of fact made in describing statements, testimony or

26  other evidence in the state court constitutes a finding by this Court.  Any absence of mention of specific evidence does not signify that the Court has overlooked the evidence in considering petitioner's claims.

27

28      [2]#29, Ex. 28, at 5-16, 27-28, 31& 43-51.  The location was due west of a point on the Strip between the Riviera Hotel and Casino and the former Sahara Hotel and Casino.

his T-shirt and pointed it at Sangines.  At this point, the first robber was standing at the front of the car near the left headlight, with the still open driver's side door between them.  Sangines testified that the first robber "was pointing the gun right in my chest and my face."  He testified that "I kind of stare in the gun, you know, I thought he was gonna shoot right way" and that "I was kind of scared."[3]

Sangines testified that at "that exact moment" a second man came from behind the van and walked over to the right front corner of the car.  The second man, the "second robber," was giving orders to the first robber.  When asked whether the second robber was also carrying anything in his hands, Sangines replied: "I didn't see clear one hand."  He testified that "I just saw one hand, because he was waving."[4]

On cross-examination, Sangines elaborated further:

> Q.     Did he – did you ever see that second individual with a gun?
>
> A.     No, because he was – first of all, I was putting my attention on the gun [being pointed at him by the first robber].  I was staring at the gun first and I just saw the guy coming out and stay over there and the guy who came behind, he was giving orders to the guy with the gun.

#29, Ex. 28, at 58.

At this point, Victor Sangines' younger brother Mario was trying to get out of the car from behind Victor, but he tripped as he was doing so.  The second robber started yelling something along the lines of "shoot him, they gonna' get something from the car, they got a gun" suggesting that Mario was reaching for a gun.  Victor turned to help his brother, who was at high risk for excessive bleeding because of medication that he took after prior heart surgeries.  As Victor turned to help his brother, he felt the first robber's gun right behind his ear.[5]

Both robbers then were yelling "we want the money."  Victor Sangines reached into his pocket with his fingers, pulled out his tip money from his cab fares that night, and gave it to the first robber. His brother Mario told the men that he did not have anything, and he showed the first robber his empty

---

[3]#29, Ex. 28, at 9-11, 32-33, 51-54 & 56-57.  As discussed *infra*, the headlights on the parked vehicle were off.

[4]#29, Ex. 28, at 9-11.

[5]#29, Ex. 28, at 12-14, 33, 60-63 & 65.

1  wallet.  At about this point, Jesus Lera was trying to get out of the passenger side at the urging of the

2  second robber.   Victor Sangines could not see if Lera gave the second robber any money.[6]

3       The first robber then started pushing Victor Sangines with the gun behind his ear, trying to move

4  the men to the back of the car.  The second robber was yelling to the first to "shoot them, they're going

5  to run away."  At the back of the car, the first robber told them to get down on the ground.  Mario said

6  to Victor that the robbers were going to kill them, but Victor said that they would not because they had

7  got what they wanted.  He pushed his brother down and lay partially on top of him to protect him.[7]

8       At approximately this point, Victor Sangines saw Jesus Lera at the back right taillight.  Lera did

9  not appear to want to go down, like he was scared and wanted to run.  Sangines testified that Lera had

10  his hands on the trunk, and that he knew that the second robber "was having something in the back of

11  Jesus or something like that, because he couldn't move."[8]

12       Sangines' related cross-examination testimony similarly left some ambiguity in the manner in

13  which the second robber was controlling Lera's movement:

14   

15      Q.    You indicated you never did actually see him with a gun, that second gun?

16      A.    No, but he was holding Jesus.

17      Q.    He was dealing directly with Jesus, right?

18      A.    Yes.

19  #29, Ex. 28, at 66.

20       As they were moving, Sangines felt the gun muzzle move to the back of his neck.  As he was

21  going to the ground, he felt a" very strong  impact" on the back of his head.  He thought that it may have

22  been the gun because he did not feel it being pressed to his neck anymore, but he did not know for sure.[9]

23      / / / /

24  _____

25  [6]#29, Ex. 28, at 14-16 & 63-65.

26  [7]#29, Ex. 28, at 16-20, 33-34 & 64-68.

27  [8]#29, Ex. 28, at 20-21, 65-66& 69.

28  [9]#29, Ex. 28, at 18-19 & 67-68.

1    After he was hit in the back of the head, Victor Sangines went to the ground "and suddenly I

2    hear a shot."  He was face down; and he did not see Lera, the shot being fired, or who fired the shot.

3    Sangines then felt himself being kicked, but he did not see who was kicking him.[10]

4    After the shot, the Sangines brothers jumped up, and Mario started yelling to call the police.

5    At this point, Lera was on his knees.   The two robbers started to run.  Victor Sangines gave chase for

6    a few feet, but one of the robbers fired another shot, prompting Sangines to stop.  He was not sure which

7    one of the robbers fired the second shot as they were running.[11]

8    The robbers ran south between the apartment buildings and across Tara.  They then split up with

9    one going west (toward Arville) and the other southeast between buildings (toward Valley View).[12]

10    When Victor Sangines returned to the other two men, they saw that Lera's arm was bleeding.

11    Mario again told Victor to call the police, reminding him that he had a cell phone in his pocket.  Victor

12    testified that he had been so excited that he forgot that he had his cell phone in his pocket.  He further

13    testified that he was so excited that he told the 911 dispatcher instead that he had been shot.[13]

14    The initial responding police officer was on patrol very close to the location.  He arrived while

15    Victor Sangines still was describing to the 911 dispatcher what had happened.[14]

16    Mario Sangines or Sangines Diaz testified substantially along the lines of his older brother's

17    testimony regarding the incident through to the 911 call.  Mario even more clearly stated a belief that

18    both robbers had a gun, although he ultimately acknowledged that he did not actually see a second gun:

19

20    _____

21        [10]#29, Ex. 28, at 19-21 & 68-71.

22        [11]#29, Ex. 28, at 21-23 & 70-72.

23        [12]#29, Ex. 28, at 23, 28-30 &72.

24        [13]#29, Ex. 28, at 23-24 & 72-73.

25        [14]#29, Ex. 28, at 25 & 42 (Sangines), *id.*, Ex. 29, at 8-13 (Officer Kusiak).

26        The Court will summarize each victim's remaining testimony more particularly related to identification after

27    outlining the three victims' principal testimony regarding what happened during the incident itself.  That is, the Court
      focuses first on testimony that either: (a) possibly would place a gun in the second robber's hand, such that he could
      have been the shooter; or, (b) if not, would have the second robber standing close enough to the shooter that gunshot

28    residue and/or blood spatter potentially may have been deposited also on the second robber and/or his clothing.

1    Q.    Could you see who was shooting [the first shot]?

2    A.    This guy [which is how the witness had been referring to the
           defendant at trial] – I don't see who is shooting, because I was in
3          the ground.

4    Q.    Of the two guys the one that had the gun to Victor's head and the
           Defendant, which one had a gun?
5
     A.    I think both have guns.
6
     Q.    You saw both with a gun, yes?
7
     A.    Yes.
8
           MR. PERCIVAL: Objection.  Leading.
9
           MR. LEWIS: He's shaking his head.  I'm getting him to
10         say yes or no.

11   Q.    You saw both of them with a gun?

12   A.    Yeah, this guy, he –

13   Q.    This guy told what?

14   A.    He show me with his hands to the other guy, what he need to do.

15                                   . . . . .

16   Q.    When did you first notice that the Defendant had a gun?

17   A.    You know, when I was back in the car, I looking like this and I
           see it.
18
     Q.    Do you remember what color or what kind of gun?
19
     A.    I don't see the gun.  I see him.  He was like this.
20
     Q.    When you say he was like this you're holding your hand like
21         you're holding something, pointing?

22   A.    Yeah.

23   #29, Ex. 28, at 95-96.

24         Jesus Lera,[15] also testified to substantially the same events, but not in exactly the same sequence

25   or order.  Lera has both robbers moving more in unison and in close proximity to one another.  Under

26

27   _____

28   [15]With regard to spelling, the transcript at the preliminary hearing has the witness spelling his name, through an
     interpreter, "L-e-r-a" whereas the trial transcript has him spelling his name "L-a-r-a."  Both are common surnames.

Lera's testimony, the two robbers first dealt with the Sangines brothers and moved them to the back of the car.  The two robbers then together made Lera exit the vehicle, moved him to the back of the vehicle, and began hitting and kicking him.  He testified that "they" hit him in the head with a gun and that he raised his arms to protect his head.  According to Lera, he was shot in the arm while he was holding his arms up by his head in this defensive position, while down on one knee.

On cross-examination, defense counsel was able to secure, at least initially, testimony from Lera placing the second robber over by Victor Sangines at the time that Lera was shot.  However, when counsel then asked the ultimate question as to whether the first robber was closer, Lera hedged:

> Q.     The first guy was closer to you than the second guy was when
>          you were at the back of the car?
>
> A.     Yes, a little bit.

#29, Ex. 28, at 132.  Counsel thereafter elicited testimony from Lera that he was "almost sure" that it was the robber "of the blue shirt" who shot him:

> Q.     You didn't see which one of the two individuals actually shot
>          you, right?
>
> A.     Yeah.  Well, I kind of looked out and I'm almost sure it was the
>          guy of the blue shirt.
>
> Q.     You're almost sure?
>
> A.     Yes.

#29, Ex. 28, at 134.[16]

Picking back up with the time line, Officer Mark Kusiak was the officer who arrived first on the scene, while Victor Sangines still was talking to the 911 dispatcher.  Officer Kusiak described Sangines'

---

[16]Clothing colors are discussed in the text, *infra*, at 8, and in particular with respect to Lera, at 13-14.

No expert testimony was tendered in the state or federal record suggesting how far away a second individual could be from the shooter and still potentially be deposited with gunshot residue and/or blood spatter.  The Court would note, however, that: (a) the distance across the rear end of a pre-2005 two-door Chevrolet Malibu Classic (see #29, Ex. 28, at 89) likely would not be substantially more than five to close to six feet; and (b) given the imprecise placement of the two robbers in the testimony, it would be difficult based on that testimony alone to wholly rule out the possibility of both men being close enough to the shooting of Lera to possibly have been the subject of deposited gunshot residue and/or blood spatter.  The Court additionally notes that both the gunshot and any resulting blood spatter initially would have been relatively high off the ground, with Lera being hit in the arm while shielding his head with his arms and being down only on one knee.

1  demeanor as "having what we call high speed wobbles" or "hyper."  He was speaking very rapidly and

2  going back and forth from one idea to another sporadically.[17]

3      Victor Sangines gave Officer Kusiak descriptions of the two robbers, using numerical height

4  and weight references as well as comparisons to his own height and weight.  Officer Kusiak described

5  Sangines as being "probably about 5'6", 5'7", maybe about 210, little wider build."[18]

6      Sangines described what Kusiak referenced as "subject number one" and "subject number two."

7  The record does not reflect that this "subject" order dovetails neatly with the "first robber" and "second

8  robber" order in which the Sangines brothers and Lera referred to the robbers at trial.[19]

9      Sangines described "subject number one" as being a 5'10" black male, but then immediately

10  thereafter he said "about my size."  Kusiak pointed out to Sangines that he was not 5'10" but instead

11  was "more 5'6", 5'7", in that area."  Sangines said "okay."  Sangines estimated the weight of subject

12  number one as "about 220, 210 pounds" and said that he was wearing a "black T-shirt, black pants."[20]

13      Sangines described "subject number two" also as a 5'10" black male, and he further stated that

14  he was 185 pounds with a "read [sic] T-Shirt, blue pants."[21]

15      Officer Kusiak radioed these descriptions to the dispatcher who relayed them to other officers

16  who were setting up a perimeter as Kusiak was speaking with Sangines.[22]

17      As Kusiak and Sangines had been speaking, within a matter of only minutes from the first initial

18  dispatch, four officers in patrol cars had created a perimeter around several blocks with apartment

19

20  _____

21      [17]#29, Ex. 29, at 12-13.

22      [18]#29, Ex. 29, at 22.  Mario Sangines and Jesus Lera were being given medical attention during this time.

23      [19]Cf. #29, Ex. 29, at 56 (referring to "first subject BMA, 5'7", 220 pounds, black shirt and black pants *with a*
    *black revolver*" and to "second subject, the same, BMA, 5'10", 180, red T-Shirt and blue pants")(emphasis added).  In

24  the context of the trial testimony, it might be expected instead that the second subject would be identified, at least per the
    trial testimony, as having the black revolver.  See also #29, Ex. 33, at 81-82 (similar description of the transcript of the

25  initial 911 call, which transcript does not appear to have been made of record in this federal habeas proceeding).

26      [20]#29, Ex. 29, at 24-25.

27      [21]#29, Ex. 29, at 25.

28      [22]#29, Ex. 29, at 15 & 23-25.

buildings in the directions in which the robbers had fled.  The rectangular perimeter was bounded by the north-south streets of Arville and Valley View and the east-west streets of Tara and Pennwood Avenue, which was two blocks south of Tara.  Each officer stationed his cruiser at one of the four intersections, used his overhead lights to illuminate the corner, and then shone the two side spotlights respectively down the two streets bounding that corner of the rectangle.  That way, the four officers collectively were able to see persons on or crossing the perimeter streets into or out of the area.  Meanwhile, canine-assisted patrols were searching the interior area of the perimeter on foot.[23]

Within eight minutes of the 00:24 a.m. initial dispatch, Officer Kusiak began receiving radio calls that officers had possibly involved persons in custody.  He took Victor Sangines to three different field showups at or near corners of the perimeter.  For the showups, Kusiak told Sangines that the subjects would not be able to see him in Kusiak's cruiser because the headlights, overhead takedown lights, and spotlights all would be shining toward the subject.  Kusiak further told Sangines:

> [W]hen we do get to the location of where these people are at, I need a hundred percent answer "Yes, this is the person" or "No, this is not the person."
>
> If you have any doubt in your mind, you need to let me know.  I cannot make an arrest or take that person into custody with some doubt.
>
> Has to be 100 percent yes, 100 percent no.

#29, Ex. 29, at 9,12, 17-18 & 26-27.

Officer Kusiak first took Sangines to a showup at the southwest corner of the rectangle, at Arville and Pennwood.  When the subjects were placed in front of the vehicle, Sangines immediately said:  "No, not involved."[24]

Meanwhile, Officer Barry Hinote had set the perimeter at the southeast corner of the rectangle, at Valley View and Pennwood.  He arrived there at approximately 00:29 a.m., within five minutes of the initial dispatch.  Within a minute of his arrival, only six minutes from the first dispatch, Officer Hinote saw an individual who he identified at trial as Alvin Rankin step out of the shadows, between

---

[23]#29, Ex. 29, at 14-17 & 29 (Officer Kusiak); *id.*, at 45-46 (Officer Hinote).

[24]#29, Ex. 29, at 19.

1  one of the apartment buildings and a van and walk east on the sidewalk on the north side of Pennwood

2  toward his vehicle.[25]

3  Officer Hinote believed that Rankin fit one of the descriptions that he had been given, and he

4  requested Rankin to come over to his patrol car.  Rankin put his hands in the air, walked to the front of

5  the vehicle, and laid his upper body across the hood.  He was perspiring profusely and appeared

6  exhausted, with the officer observing that his heart was beating rapidly.  Rankin was wearing all black

7  clothing.  He was covered in what appeared to be brown dirt, "[m]ostly on the front of his torso and

8  upper thighs."  He had a new scratch or "deep . . . laceration like a cut of some kind" across the bottom

9  of his Adam's apple.  He also had a fresh, open wound to the palm of his right hand.[26]

10  The straight line distance between the scene of the incident and the corner of Valley View and

11  Pennwood would appear to be less than a half mile.  An individual walking at a brisk five mile per hour

12  pace would cover a straight line distance of less than a half mile in under six minutes.[27]

13  As Officer Kusiak was bringing Victor Sangines around a few minutes later, Officer Hinote had

14  Rankin stand in front of his patrol car facing out toward the other vehicle.  Rankin's hands were

15  handcuffed behind his back, but the handcuffs would not be visible to the occupants of the other

16  vehicle.  Hinote stood besides Rankin with his own arms also behind his own back, to create an

17  appearance that both men simply were standing in a similar position with their arms behind their back.[28]

18  After Officer Kusiak drove up and stopped the vehicle, Sangines immediately said: "Yes, he is

19  one of the gentlemen that was involved."  Officer Kusiak described the subject at the second showup

20  as "a black male, approximately five foot seven, to me he looked to be about 185 pounds, black T-Shirt,

21  black pants."  The officer further observed:

22

23  [25]#29, Ex. 29, at 46-47 & 54.

24  [26]#29, Ex. 29, at 48, 52-56 & 60-61.

25  [27]The directions feature on www.maps.google.com reflects that the driving distance from the address on Tara is
26  approximately .4 miles east on Tara and then approximately .15 miles south on Valley View.  The Court's math would
   suggest a straight line distance of approximately .427 miles.  Accord #29, Ex. 29, at 9-10 & 25-26 (testimony regarding
27  the approximate distance from a position just north of Tara on Valley View to the scene of the incident).

28  [28]#29, Ex. 29, at 49-51 (Officer Hinote); see also id., at 28-29 (Officer Kusiak).

-10-

1
2
> "[H]e was sweating profusely.  His chest was pounding up and down like he had just did running or high exertion type activity."

3   #29, Ex. 29, at 19-20 , 27-28 & 30 (Officer Kusiak refers to Sangines making the positive identification
4   "the moment I stopped my vehicle").

5       Officer Kusiak thereafter took Sangines to a third showup at Silver Dollar Avenue and Valley
6   View, which was to the north of the second showup at approximately half the distance to Tara.
7   Sangines stated that the individual at the third showup was not involved.[29]

8       At trial, Victor Sangines identified Alvin Rankin on direct examination as the second robber.
9   Sangines testified that Rankin was wearing baggie black pants and a dark T-shirt at the time.  He could
10  not recall whether Rankin was wearing anything on his head.  He described Rankin's hair as short and
11  his face as "kind of rough . . . like he didn't shave."  He placed his weight at "maybe 180."[30]

12      In his testimony at trial, Victor Sangines still was describing himself as 5'10" tall when
13  comparing his height to that of the robbers:

14      Q.    How tall are you?

15      A.    About 5'10".

16      Q.    And the two people that you saw that night, the first night [sic]
17            that you saw them, compared to you was he taller or shorter?

18      A.    We can still come out the same size, a little bit shorter, but about
            the same size.

19      Q.    What about the Defendant; do you think he's taller or shorter?

20      A.    I think he's about the same size, to me.

21  #29, Ex. 28, at 36; see also *id.*, at 57 (again using 5'10" as the supposed common height).

22      Sangines stated that he was facing the second robber after his brother tripped getting out of the
23  car and the second robber was yelling to shoot him.  After defense counsel later inquired on cross-
24  examination about Sangines' degree of attention with a gun pointed at him, Sangines referred back to

25

26      [29]#29, Ex. 29, at 20.  Silver Dollar is an east-west street approximately halfway between Pennwood and Tara.
27  Silver Dollar was the only east-west street within the perimeter established that crossed all the way from Valley View to
    Arville.

28      [30]#29, Ex. 28, at 11-12, 26, 33, 57-60 & 73-78.

1    the same point where the second robber was saying to shoot his brother Mario after he stumbled.

2    Sangines stated: "I was staring at the Defendant.  That's when I stare at him, because I was looking right

3    at him."[31]

4            Sangines testified that "I think it was like three" people at the first showup, just Rankin at the

5    second showup, and one person at the third showup.  He testified that Rankin was wearing the same

6    dark T-shirt and baggie pants that he had described and that he "was very sweaty and kind of dirty" at

7    the time of the second showup.  At trial, he could not recall an extensive amount of specifics regarding

8    the four persons collectively at the first and third showups, but he stated that none of the four were one

9    of the two robbers.[32]

10           When defense counsel framed a question on cross-examination in terms of Victor Sangines'

11   having identified Rankin as someone he "believed was involved in the robbery," Sangines responded:

12   "Yes.  I was very sure."[33]

13           When asked how sure on redirect, he responded: "Hundred percent."[34]

14           Both Mario Sangines and Jesus Lera had been examined and then taken away for medical

15   attention while Victor Sangines was providing a description to officers and viewing the showups.

16           At trial, Mario Sangines testified as follows regarding his description and identification of the

17   second robber.  He told the police at the hospital that: (a) he did not know whether the second robber

18   had facial hair or not because it was too dark; (b) the second robber was shorter than the first robber but

19   both similarly were of a muscular build; and (c) he would be able to identify the men again because "I

20   see his face close."  Sangines identified Rankin at trial as the second robber.  He based his identification

21   on having been focused at the time on the second robber's face when it was in the light at one point,

22   rather than upon what the two robbers were wearing.  He maintained, referring to Rankin at the trial,

---

24   [31]#29, Ex. 28, at 33 & 60-63.

25   [32]#29, Ex. 28, at 37-40 & 78-83.  Sangines was able to recall a number of specifics regarding other individuals
26   at the showups; he just did not recall an extensive amount of such specifics.

27   [33]#29, Ex. 28, at 82.

28   [34]#29, Ex. 28, at 85.

that "I see this guy close."  When asked on redirect how sure he was that Rankin was the second robber that he saw that night, he responded: "One hundred percent."[35]

At trial, Jesus Lera identified Rankin on direct as "an individual that was among the two people that robbed [him] that evening."[36]

Lera's identification-related testimony on cross-examination was not exceedingly strong.

When asked what the first robber looked like, Lera responded initially: "It's been a long time. I don't remember that.  I remember some."  He testified that the first robber was wearing a blue shirt. Defense counsel then asked him about his statement to the police at the hospital that the first robber instead was wearing a burgundy shirt.  Lera, ultimately, acknowledged the prior inconsistent statement but stated: "Yeah.  Well, it's been so long.  I don't remember that much."  He then stated:  "I remember telling him it was kind of burgundy or blue," despite what the transcribed statement reflected.  When asked a direct question of whether the second robber was thinner than the first, he responded: "I was very nervous.  I didn't know to stay or to run."[37]

Lera also responded somewhat evasively and vaguely when defense counsel inquired regarding his prior response to the police as to whether he would be able to identify the robbers:

> Q.    Okay.  Didn't you in fact tell the police officers that you weren't even sure you would be able to recognize either one of these guys if you saw them again?
>
> A.    I cannot tell you.  I'm scared, very frightened.

---

[35]#29, Ex. 28, at 90-91 & 105-14.  Sangines' trial testimony does not unambiguously establish that he told the police at the hospital that the second robber was wearing a black shirt and pants.  See *id.*, at 90 & 108.  The Court notes in passing that his transcribed statement from July 3, 2004, reflected that he told the police that the second robber was wearing a black T-shirt and black pants. #28, Ex. 2, at 7.  The Court's harmless error assessment is directed instead to the evidence as it was presented at trial.

With regard to the evidence that actually was before the jury at trial, Mario Sangines did not testify as to any prior identifications of Rankin as the second robber.  He was asked specifically only whether he had "been asked to identify suspects from a group of photographs," to which question he responded "no." #29, Ex. 28, at 110.  It has been suggested at one time or another, as referenced *infra* in the discussion of amended Ground 1, that Sangines may have looked in the courtroom and seen Rankin in jail clothing at the preliminary hearing.  The Court's focus with particular regard to Grounds 2 and 3(c), however, is on the evidence actually before the jury at trial.

[36]#29, Ex. 28, at 125-26.

[37]#29, Ex. 28, at 126-30.

-13-

| | | |
|---|---|---|
| Q. | Understandably, but the question was you did tell the police officers that you didn't know whether you would be able to identify either of these people, didn't you? |
| A. | I remember telling them that if I saw him, yes. |
| Q. | [Counsel then has the witness read the relevant portion of his police statement.] |
| | So on the night you were being interviewed at the hospital you told the officers you didn't know if you could recognize these guys if you saw them again, correct? |
| A. | Okay.  I remember I was very frightened and since I've got family, that might have played a role. |

#29, Ex. 28, at 135-36.

The State had asked both Vincent Sangines and Mario Sangines on redirect how sure they were of their identification of Rankin, prompting their responses of a "hundred percent."  The State declined the opportunity to ask Jesus Lera any questions on redirect.[38]

The trial evidence fairly consistently established that the area where the post-midnight robbery occurred was not well lit.  There was a light on the back side of the apartment building directing light east and west, with the parking area being immediately to the north of the building.  This light did not appear to shine directly down fully underneath the awning under which Sangines parked his vehicle.  The vehicle lights were off during the robbery.[39]

Officer Hinote, who took Rankin into custody, testified at trial: "I know he's about 5'7", maybe 170."  What was referred to at trial simply as "the SCOPE printout" reflected that Rankin was 5'6" tall and weighed 145 pounds.  When Officer Hinote was asked whether those measurements were consistent

---

[38]#29, Ex. 28, at 136.

With regard again to the evidence that actually was before the jury at trial, Jesus Lera did not testify as to any prior identification of Rankin.  He was asked only whether he had been asked to pick an individual out of a group of photos or a group of people. #29, Ex. 28, at 136.  Lera identified Rankin at the preliminary hearing in response to a question of whether he saw anyone in the courtroom "that pointed the gun at you that night on July 3." #28, Ex. 10, at 42 (along with testimony at page 44 of the transcript that the second robber pointed a gun at him).  The Court's focus with particular regard to Grounds 2 and 3(c), however, remains on the evidence actually before the jury at trial.

[39]#29, Ex. 28, at 50-51& 53 (Victor Sangines); *id.*, at 101-02 & 106-07 (Mario Sangines); *id.*, at 129 (Jesus Lera, with some variation, as in his other trial testimony); #29, Ex. 29, at 37-41 (crime scene analyst).

-14-

1   with his observation of Rankin while in close proximity, he replied: "I thought he was heavier than

2   that."[40]

3        The defense presented expert testimony by Dr. Robert Shomer, Ph.D., a forensic psychologist.

4   He testified regarding the extent to which various factors might impact the reliability of eyewitness

5   identification, including, *inter alia*, cross-racial identification, the impact of having a gun pointed at the

6   victim, the overall emotional excitement of the event, lighting, the identification procedures used, and

7   the time between the event and the identification.[41]

8                      ***Standard of Review***

9        The Antiterrorism and Effective Death Penalty Act (AEDPA) imposes a "highly deferential"

10   standard for evaluating state-court rulings that is "difficult to meet" and "which demands that state-court

11   decisions be given the benefit of the doubt." *Cullen v. Pinholster*, 131 S.Ct. 1388, 1398 (2011).  Under

12   this highly deferential standard of review, a federal court may not grant habeas relief merely because

13   it might conclude that a decision was incorrect.  131 S.Ct. at 1411.  Instead, under 28 U.S.C. § 2254(d),

14   the court may grant relief only if the  decision: (1) was either contrary to or involved an unreasonable

15   application of clearly established law as determined by the United States Supreme Court based on the

16   record presented to the state courts; or (2) was based on an unreasonable determination of the facts in

17   light of the evidence presented at the state court proceeding.  131 S.Ct. at 1398-1401.

18        A state court decision on the merits is "contrary to" law clearly established by the Supreme

19   Court only if it applies a rule that contradicts the governing law set forth in Supreme Court case law or

20   if the decision confronts a set of facts that are materially indistinguishable from a Supreme Court

21   decision and nevertheless arrives at a different result.  *E.g.*, *Mitchell v. Esparza*, 540 U.S. 12, 15-16

22   (2003).  A decision is not contrary to established federal law merely because it does not cite the

23   Supreme Court's opinions.  *Id.*  Indeed, the Court has held that a state court need not even be aware of

24   its precedents, so long as neither the reasoning nor the result of its decision contradicts them.  *Id.*

25

26       [40]#29, Ex. 29, at 60-61.  A SCOPE printout is a criminal history record used by the Las Vegas Metropolitan

27   Police Department.

28       [41]#29, Ex. 33, at 3-60.

Moreover, "[a] federal court may not overrule a state court for simply holding a view different from its own, when the precedent from [the Supreme] Court is, at best, ambiguous."  540 U.S. at 16.  For, at bottom, a decision that does not conflict with the reasoning or holdings of Supreme Court precedent is not contrary to clearly established federal law.

A state court decision constitutes an "unreasonable application" of clearly established federal law only if it is demonstrated that the state court's application of Supreme Court precedent to the facts of the case was not only incorrect but "objectively unreasonable."  *E.g., Mitchell*, 540 U.S. at 18; *Davis v. Woodford*, 384 F.3d 628, 638 (9th Cir. 2004).

To the extent that the state court's factual findings are challenged, the "unreasonable determination of fact" clause of Section 2254(d)(2) controls on federal habeas review.  *E.g., Lambert v. Blodgett*, 393 F.3d 943, 972 (9th Cir. 2004).  This clause requires that the federal courts "must be particularly deferential" to state court factual determinations.  *Id*.  The governing standard is not satisfied by a showing merely that the state court finding was "clearly erroneous."  393 F.3d at 973.  Rather,  AEDPA requires substantially more deference to the state court's determination:

> . . . .  [I]n concluding that a state-court finding is unsupported by substantial evidence in the state-court record, it is not enough that we would reverse in similar circumstances if this were an appeal from a district court decision. Rather, we must be convinced that an appellate panel, applying the normal standards of appellate review, could not reasonably conclude that the finding is supported by the record.

*Taylor v. Maddox*, 366 F.3d 992, 1000 (9th Cir. 2004); *see also Lambert*, 393 F.3d at 972.

Under 28 U.S.C. § 2254(e)(1), state court factual findings are presumed to be correct unless rebutted by clear and convincing evidence.

The petitioner bears the burden of proving by a preponderance of the evidence that he is entitled to habeas relief.  *Pinholster*, 131 S.Ct. at 1398.

### *Discussion*

### *Ground 1: Identification Testimony*

In amended Ground 1, petitioner alleges that he was denied due process when the identification testimony of Mario Sangines and Jesus Lera was admitted despite allegedly unreasonably suggestive identification procedures.  In current Ground 1, and in the claim exhausted in state court, petitioner has

-16-

1   claimed that their identification testimony was the product of a unreasonably suggestive identification

2   procedure because the first time that they were asked to identify Rankin following the July 3, 2004,

3   robbery was at the July 26, 2004, preliminary hearing as to Jesus Lera and at trial on April 26, 2005,

4   as to Mario Sangines.  Petitioner alleges that such in-court identifications were inherently suggestive.

5   In the current claim, as amended, petitioner does not challenge Victor Sangines' identification of Alvin

6   Rankin as the second robber at a field showup, at the preliminary hearing, and at trial.[42]

7       The Supreme Court of Nevada rejected the exhausted claim on the ground that the reliability

8   analysis in *Neil v. Biggers*, 409 U.S. 188 (1972), did not apply to such an in-court identification.  The

9   _____

10      [42]See #46, at 10-12 (third amended petition).  In the second amended petition, petitioner alleged that Mario
    Sangines had made an unduly suggestive out-of-court identification at the time of the preliminary hearing by looking

11   into the courtroom at the request of the prosecutor.  The Court held that this claim was not exhausted because it was
    premised upon a factual basis that was diametrically opposed to the factual basis presented in the claim exhausted in the

12   state courts – that Sangines had identified Rankin for the first time at trial.  See #41, at 5-12.  *Accord Dickens v. Ryan*,
    740 F.3d 1302, 1318 (9th Cir. 2014)(*en banc*)(reaffirming that a claim has not been fairly presented in state court if new

13   factual allegations either fundamentally alter the legal claim already considered by the state courts or place the case in a
    significantly different and stronger evidentiary posture than it was when the state courts considered it).  Respondents

14   further had contended that the ground was unexhausted because it sought to claim that the Victor Sangines identification
    testimony was the product of an unduly suggestive identification.  Petitioner asserted in response that "any discussion of

15   Victor Sangines in this Ground was for the purpose of providing factual context only." #40, at 4.

16      Rankin nonetheless suggests in the third amended petition – after the exhaustion issue already had been

17   addressed – that a substantive claim challenging the Victor Sangines identification testimony was exhausted in the state
    post-conviction petition. #46, at 11 n.5.  Therein, he challenged an alleged showup identification by *Mario* Sangines.

18   The only reference to Victor in the claim is to testimony regarding lighting.  Rankin perhaps named the wrong Sangines
    brother in the claim, but he did not exhaust a challenge to an alleged showup identification by Victor rather than Mario.

19   See #30, Ex. 66, at 10E-10F.  When exhaustion was being considered, petitioner did not argue that a claim challenging
    Victor Sangines' identification testimony was exhausted, instead stating that his testimony was referenced only for

20   context.  A footnote in a pleading is not a motion for reconsideration.  The claim is unexhausted.

21      Petitioner "eliminated all references to the out-of-court identification made by Victor Sangines" from the third
    amended petition. #46, at 11 n.5.  No such claim is before the Court.  Petitioner nonetheless again questions the Victor

22   Sangines identification in the reply, either in or in reference to Ground 1. See #49, at 8, lines 22-23, & 15, lines 3-4.

23      To be abundantly clear, if petitioner makes any further attempt to challenge the Victor Sangines identification

24   under Ground 1 while also maintaining that he is not doing so, the Court will immediately dismiss the action for lack of
    complete exhaustion if there are extant proceedings at that time.  Petitioner has had ample opportunity both to argue the

25   point and to present a petition with only exhausted claims.  In short, again saying one thing while doing another with
    respect to this claim will get the entire petition dismissed for lack of exhaustion without regard to other issues.  The

26   Court will regard such an effort as a failure by a represented petitioner to unequivocally dismiss an unexhausted claim
    after having been given *ample* opportunity to do so, resulting in immediate dismissal under the rule of *Rose v. Lundy*,

27   455 U.S. 509 (1982).  To the extent that petitioner queries the Court's prior action in note 3 of the last pleading, counsel
    must read and follow the order actually issued in the case.  The actual order, not "accepted practice," governs.  The

28   order clearly directed the filing of a "*motion* for dismissal . . . and/or for other appropriate relief," not a notice.

-17-

1    state high court held that rule in *Biggers* does not extend to such an identification because the presence

2    of the judge and defense counsel along with the availability of cross-examination provided adequate

3    safeguards against suggestiveness.[43]   During the pendency of this action, the United States Supreme

4    Court held in *Perry v. New Hampshire*, 132 S.Ct. 716 (2012), that an identification that is not procured

5    under circumstances arranged by law enforcement is not subject to the *Biggers* reliability analysis.

6    Petitioner has acknowledged that *Perry* "is determinative of the claim raised in Ground One as that

7    claim currently stands."[44]   The state supreme court's rejection of the claim in any event was neither

8    contrary to nor an unreasonable application of clearly established federal law as determined by the

9    United States Supreme Court even prior to *Perry* and at the time of the November 13, 2006, state

10   supreme court decision.  *See, e.g., United States v. Domina*, 784 F.2d 1361, 1367-69 (9th Cir.

11   1986)("[t]he Supreme Court has not extended its exclusionary rule to in-court identification procedures

12   that are suggestive because of the trial setting").

13        Ground 1 therefore does not provide a basis for federal habeas relief.

14   ***Ground 2: Limitation on Cross-Examination as to Gunshot Residue and Blood Spatter Testing***

15        In Ground 2, petitioner alleges that he was denied rights to present a defense and to a fair trial

16   under the Fifth, Sixth and Fourteenth Amendments because the trial court barred the defense from

17   establishing on cross-examination that the police had not conducted gunshot residue or blood spatter

18   testing to determine whether there was physical evidence connecting Rankin to the robbery.

19        The relevant trial evidence is summarized, *supra*, at 2-15.  The summary focuses, first, on the

20   extent to which the second robber possibly may have been exposed to gunshot residue and blood spatter

21   and, second, on the trial testimony identifying Rankin as the second robber.

22        At trial, defense counsel asked the crime scene analyst: "Have you ever been asked to perform

23   or have you performed parafin [sic] testing on any subject?"  After an objection and a bench conference,

24   counsel then asked:  "Were you requested to perform parafin testing?"  The trial court stated: "Excuse

25   me, I'm going to disallow that."  See #29, Ex. 29, at 41-42.

26   _____

27        [43]#30, Ex. 62, at 1-3.

28        [44]#52, at 2.

-18-

1    At the next break outside the presence of the jury, the court and counsel made a record as to the

2    inquiry being sought, the objection made, and the court's ruling.

3    Defense counsel stated that it would have been the defense's intent at that time to question the

4    crime scene analyst "concerning the performance or non-performance of gunshot residue or parafin

5    testing on the Defendant." He stated that it was his understanding that the trial court had barred the line

6    of questioning "because the Court didn't want the matter to turn into me trying to place the Metropolitan

7    Police Department on trial."[45]

8    It was acknowledged by all during the discussion outside the presence of the jury that no gunshot

9    residue testing had been done.[46]

10    The prosecutor noted that she had objected "to the one question" – as to whether the analyst ever

11    had been asked to perform paraffin testing – on the basis of relevance.  She stated that with her

12    objection as to relevance "to that one question," she would submit it.[47]

13    The trial court explained its reason for not permitting the cross-examination as follows:

14    The reason I disallowed the question or the line of questioning is
       that I did not think it was relevant to this case and it was – there was a
15    very distinct possibility of misleading the jury.

16    . . . . .

17    I think there was a distinct disservice to the truth, to the process
       of finding the truth by bringing this out.  Let me explain my thinking.
18
       . . . . .
19
20    Assuming that [there was no evidence that tests were performed,
       as appeared to be the case], . . . there is very definitely a danger that the
21    jury would be left with the impression that somehow the Metropolitan
       Police Department was remiss in their investigation or they shirked the
22    responsibility that ordinarily would be theirs to perform such tests.

23    I mentioned at the bench we're not putting Metro on trial here.
       That's a rather glib way of explaining my thinking at the time.  I didn't
24    have time to go into all the particulars.

25    _____

26    [45]#29, Ex. 29, at 62-63.

27    [46]#29, Ex. 29, at 63-64.

28    [47]#29, Ex. 29, at 64.

1

2

3

> This would leave the jury with the impression that somehow something should have been done that wasn't and that very possibly there was evidence left out of these proceedings that would exonerate the Defendant, which is clearly erroneous.  For that reason I disallowed the question.

4 #29, Ex. 29, at 64-66.[48]

5 Consistent with the trial court's ruling that the defense could not cross-examine the crime scene

6 analyst in a manner that questioned the extensiveness of the police investigation, defense counsel

7 presented no argument in his closing as to the lack of forensic test evidence tying Rankin to the crime.[49]

8 During the closing arguments, the State argued at some length in its rebuttal – in response to a

9 defense argument that Rankin should be acquitted of a charge of attempted murder – *inter alia* that

10 "[c]hances are it had to have been the Defendant who fired that shot."[50]

11 On direct appeal, defense counsel raised a claim that the trial court had improperly limited the

12 defense cross-examination of the crime scene analyst.  Counsel expanded the claim beyond what at least

13 had been explicitly stated in the trial court record.  Counsel referred to an effort to cross-examine the

14 analyst as to whether she performed gunshot residue testing "on the skin or clothes" of Rankin.  Counsel

15 further stated that it was his "intention to cross-examine the crime scene investigator concerning the

16 performance or non-performance of blood spatter testing on the Defendant's clothing."[51]  The State did

17 not challenge what at least arguably was an expansion of the claim.  The State instead characterized the

18 trial court ruling as one barring the defense "from asking a crime scene investigator whether gunshot

19 residue or blood spatter testing were conducted on defendant."[52]

20 The state supreme court decided the claim based upon that characterization of the record.

21

---

22 [48]See also *id.*, at 74-76 (barring the defense from using expert witness testimony to criticize the field showup

23 procedure used by the local police as not being consistent with Department of Justice procedures "because what it suggests is somehow Metro's procedure is shoddy in their methodology and somehow needs to be criticized," which the

24 trial court characterized as "nonsense" that "won't be allowed").

25 [49]See #29, Ex. 33, at 74-97.

26 [50]#29, Ex. 33, at 105-07.

27 [51]#29, Ex. 51, at 12 (electronic docketing page 18).

28 [52]#29, Ex. 52, at 6-7 (electronic docketing pages 11-12).

The Supreme Court of Nevada rejected the claim as presented on the following basis:

> . . . Rankin contends that the district court abused its discretion by limiting defense counsel's cross-examination of the crime scene investigators.  Citing to United States v. Hoffman and United States v. Pointdexter, Rankin argues that the district court erred by limiting his cross-examination because the lack of physical evidence in the case, such as gun powder residue and blood spatter, supported his defense that he was misidentified as the man in close proximity to the shooter.  We agree.
>
> A criminal defendant has a right to cross-examine witnesses against him, which includes presenting "any relevant evidence and testimony at trial that someone other than the defendant committed the offense."  However, district courts also have the discretion to limit the scope of cross-examination.  In this case, the trial court did not allow defense counsel to question the crime scene analyst about the nonperformance of paraffin or blood spatter evidence because it found that the line of questioning was not relevant to the case and posed a "very distinct possibility of misleading the jury."  We conclude that the district court abused its discretion by limiting the cross-examination of the crime scene analyst because testimony about the lack of physical evidence and whether police procedures were followed supported Rankin's misidentification defense.[FN10]  We further conclude, however, that any error was harmless beyond a reasonable doubt.  The prejudicial nature of the error was minimal because the cross-examination of the crime scene analyst would not have revealed any exculpatory evidence.  Additionally, the State's evidence against Rankin was convincing.  We note that Rankin was identified as a participant in the robbery by three different eyewitnesses.  Further, Rankin was found in the vicinity of the robbery immediately after it occurred; police described him as sweating profusely, dirty, and having what appeared to be new lacerations or scratches on his neck and hand.  Although the charged crimes were serious, we conclude beyond a reasonable doubt that the error in limiting cross-examination did not undermine the reliability of the jury's verdict.[FN11]
>
> [FN10] See generally Harris v. State, 106 Nev. 667, 670, 799 P.2d 1104, 1106 (1990) (defendant is entitled to present defense theory of the case); see also Commonwealth v. Miles, 648 N.E.2d 719, 724 (Mass. 1995) ("It is well-settled that a defendant has a right to expose inadequacies of police investigation, and the trial court should not preclude cross-examination on whether police procedures were followed.").
>
> [FN11] See Chapman v. California, 386 U.S. 18, 24 (1967).

#30, Ex. 62, at 3-5 (citation footnotes 5-9 omitted).

In the answer, respondents do not dispute the presence of federal constitutional error.  Respondents contend that the Court should find the error harmless under the *Brecht* standard.

-21-

1   The *Brecht* harmless error standard, delineated further below, applies where constitutional error

2 has been demonstrated on federal habeas review.  Following the Supreme Court's decision in *Fry v.*

3 *Pliler*, 551 U.S. 112 (2007), the federal court applies *Brecht* "without regard for the state court's

4 harmlessness determination."  *Pulido v. Chrones*, 629 F.3d 1007, 1012 (9th Cir. 2010).  That is, the

5 federal court does not conduct a deferential review under AEDPA of whether the state court's

6 determination under the *Chapman v. California*, 386 U.S. 18 (1967), harmless-error standard was

7 contrary to or an unreasonable application of clearly established federal law.  *Id.*  Rather, such an

8 inquiry inherently is subsumed within the analytic framework of the *Brecht* test, such that the federal

9 court accordingly simply applies the *Brecht* standard directly without regard to the state court's

10 application of *Chapman*.  *Id.*[53]

11   As noted at the beginning of this order, the controlling question under *Brecht* is whether the trial

12 error "had substantial and injurious effect or influence in determining the jury's verdict."  507 U.S. at

13 623.  The *Brecht* standard examines whether the constitutional error substantially influenced the

14 outcome of a case:

15     [I]f one cannot say, with fair assurance, after pondering all that
happened without stripping the erroneous action from the whole, that the

16     judgment was not substantially swayed by the error, it is impossible to
conclude that substantial rights were not affected.  The inquiry cannot be

17     merely whether there was enough to support the result, apart from the
phase affected by the error.  It is rather, even so, whether the error itself

18     had substantial influence.

19 *Merolillo v. Yates*, 663 F.3d 444, 454 (9th Cir.2011) (quoting *Kotteakos v. United States*, 328 U.S. 750,

20 765 (1946)).  "Where the record is so evenly balanced that a judge 'feels himself in virtual equipoise

21 as to the harmlessness of the error' and has 'grave doubt about whether an error affected a jury

22 [substantially and injuriously], the judge must treat the error as if it did so.'"  *Id.* (quoting *O'Neal v.*

23 *McAninch*, 513 U.S. 432, 435 (1995))(alteration in original)(internal quotations omitted).

24

25     [53]In the federal reply, petitioner argues the issue instead as one of applying the AEDPA standard of review to

26 the state supreme court's application of the *Chapman* harmless-error standard and then applying *Brecht* if the state
court's decision does not withstand review under AEDPA.  #49, at 10-11.  Such an analysis, along with the pre-2007

27 case authority cited by petitioner, was superceded by *Fry.  See also Ayala v. Wong*, ___ F.3d ____, 2014 WL 707162, at
slip *13 & nn. 13 & 14 (9th Cir. Feb. 25, 2014)(discussion of relationship between AEDPA standard of review and

28 *Brecht* analysis).

The trial error in the present case consisted of an erroneous limitation on cross-examination that impinged upon the right to present a defense. The trial court prevented the defense from establishing and focusing on the fact that the State had not conducted forensic testing that would have established whether there possibly was physical evidence linking Rankin to the crime. In applying the *Brecht* standard to a trial error of this nature, the Court looks to the strength of the State's trial evidence viewed within a context in which the objective of the cross-examination would have been achieved. That is, the Court looks to the strength of the State's evidence in a scenario in which the defense instead would have been allowed to elicit testimony from the crime scene analyst that the police did not test Rankin's hands or other exposed skin at the time for the presence of gunshot residue and/or blood spatter and did not thereafter test his clothes for the presence of gunshot residue and/or blood spatter.[54]

In conducting a *de novo* application of the *Brecht* standard, this Court is not as sanguine as was the state supreme court that the fact that Rankin was identified by all three of the eyewitnesses weighs extraordinarily heavily in the balance. To be sure, the fact that Jesus Lera and Mario Sangines also identified Rankin did corroborate Victor Sangines' identification testimony and bolster the State's case. However, all identifications, including identifications that pass constitutional muster, are not necessarily of equal weight or reliability in terms of weighing the potential effect of a trial error on a jury's verdict. This case clearly was not one where all three men each independently picked Rankin out of a physical lineup or photographic array with multiple individuals of a similar appearance shortly after the incident with no possible inkling of even whether another one of the men had identified a suspect, much less who. That of course would be a situation where each one of three separate and independent identifications would provide fairly compelling corroboration of the other identification testimony.

---

[54]*Cf. Cudjo v. Ayers*, 698 F.3d 752, 768-69 (9th Cir. 2012), *cert. denied*, 133 S.Ct. 2735 (2013)(looking to similar criteria). The five factors applied under *Delaware v. Van Arsdall*, 475 U.S. 673 (1986), are not relevant in this context. *Van Arsdall* concerned a limitation on cross-examination directed to impeaching the credibility of a witness, in violation of the confrontation clause. This case concerns a limitation on cross-examination directed to developing non-impeachment evidence in support of a defense argument, in violation of the right to present a complete defense. *Van Arsdall* refers to, *inter alia*, the importance of the witness' testimony in the prosecution's case, whether the testimony was cumulative, the extent to which the witness' testimony was supported or contradicted by other evidence, and the cross-examination otherwise allowed. These factors have no relevance to the type of error presented in this case. The defense was not trying to impeach the crime scene analyst's credibility. The defense instead was seeking to use the crime scene analyst to establish a factual point to be relied upon by the defense in presenting a complete defense.

1        That is not what happened in this case.  Rather, without any violation of a rule of sequestration,

2    both Jesus Lera and Mario Sangines readily would have known at the time of both the preliminary

3    hearing and the trial that Mario's brother had identified the defendant in the case as one of the two

4    robbers.  And it would be a fair assumption, even without knowing the racial composition of the

5    remaining occupants of the courtroom, that the man who Victor Sangines previously had identified as

6    one of the robbers would be the young black male sitting up front at the counsel table with his lawyer.

7    So, while the in-court identifications by Jesus Lera at the preliminary hearing and by Mario Sangines

8    at trial present no constitutional issue under *Perry*, that does not necessitate a conclusion that the

9    identifications should be weighed as  providing compelling corroboration.  That conclusion follows

10    especially as to the Jesus Lera identification testimony, given his weak testimony at trial.  In assaying

11    the strength of the State's case against Rankin in considering the impact of a trial error, the Court cannot

12    wholly ignore the not unrealistic possibility that the later identifications could have been influenced by

13    the knowledge that Victor Sangines already had identified the defendant at counsel table as one of the

14    robbers.  The later identifications do corroborate Victor Sangines' identification, but the Court does not

15    place substantial reliance upon the fact that all three eyewitnesses identified Rankin as a basis for

16    finding harmless error on the record presented in this case.  The later two identifications assuredly

17    bolstered the State's case, but not compellingly so on these facts, in a case where identification

18    testimony was the State's *only* direct evidence tying Rankin to the crime.

19        That said, Victor Sangines' identification testimony was strong in and of itself.  Sangines did

20    not simply identify the first subject put before him in front of a police cruiser in a field showup.  He

21    rejected the first three subjects presented in the first field showup and then thereafter made an

22    immediate positive identification of Rankin as he arrived at the second showup, immediately reflecting

23    that he recognized him as one of the two robbers from a crime that had occurred only moments before.

24    Nor did Sangines simply identify random subjects in front of police cruisers until he had two robbery

25    suspects.  With the opportunity to select two suspects from five subjects, he selected only one, without

26    succumbing to any possible internal pressure to pick two suspects because there had been two robbers.

27        Petitioner relies heavily on Victor Sangines' description of the robbers as being 5'10" tall with

28    Rankin instead being only 5'6" tall.  However, Mr. Sangines apparently had some difficulty admitting

to himself that he was only 5'6" or 5'7" tall.  He consistently identified himself instead as 5'10" and *then* stated that the robbers were of the same height as he was.  Given that Sangines in truth was only 5'6" or 5'7" tall, he in effect was testifying that the robbers also were – as he testified, "about my size" – 5'6" to 5'7" tall.  The jury – which directly observed the witness at trial – was not required to ignore that Mr. Sangines clearly was in denial as to his own height.  Nor is this Court required to do so in considering the effect of the trial error on the jury's verdict.[55]

Petitioner otherwise points to not necessarily atypical variances between a witness' initial description and a defendant's alleged actual appearance.  For example, individuals typically are not called upon to make accurate estimates of other individual's weight as a regular part of their daily routine.  Even the initial custodial officer in the case – who would have had more both training and experience in accurately describing subjects – thought that Rankin weighed more than 145.  As identification testimony goes, Victor Sangines' identification testimony was fairly strong identification testimony.[56]

Rankin's appearance when he initially was taken into custody provided further circumstantial evidence corroborating the identification testimony.  Within six minutes of the initial dispatch, Rankin exited the very area that then actively was being searched by canine patrols, and he was continuing in the same direction in which one of the robbers had fled initially.  The distance between the robbery scene and the location was one that could be covered on foot in the time involved.  Rankin presented with every appearance of an individual who had been running and hiding and/or trying to crawl through or over obstacles in a dark residential setting.  His heart was pounding; he was sweating profusely; and he appeared exhausted.  Rankin's clothing was covered with brown dirt on the front of his torso and

---

[55]See text and record cites, *supra*, at 8, 11 & 14-15.

[56]By way of contrast, if Jesus Lera's trial identification testimony instead had been the principal identification testimony supporting the conviction, a markedly different harmless error issue would have been presented in connection with this trial error.

Petitioner challenges the strength of the identification testimony by referring back to the witnesses' written statements.  E.g., #49, at 11(reply).  The harmless error analysis instead is directed – when weighing the strength of the State's evidence – to the evidence actually before the jury.  The content of the written statements is pertinent to that inquiry only to the extent that such content became part of the trial record that was before the jury.

1   upper thighs, and he had fresh cuts on both his neck and the palm of his hand.  He still was sweating

2   profusely and obviously trying to catch his breath moments later when the investigating officer brought

3   Victor Sangines around for a field showup, further reflecting the amount of physical exertion that he

4   had just engaged in.  Rankin gave every appearance of someone who had been running from a crime.[57]

5          Against the backdrop of the identification and circumstantial evidence, the testimony sought

6   from the crime scene analyst would not have fundamentally altered the evidence before the jury at trial

7   and would not have called other prosecution evidence directly into question.  Without the testimony,

8   the jury had before it a case based only on identification testimony and circumstantial evidence.  With

9   the testimony, the jury would have had before it a case based only on identification testimony and

10  circumstantial evidence.  The testimony would have established only that the police had not conducted

11  forensic testing that – only possibly and certainly not invariably – could have produced physical

12  evidence linking Rankin to the crime if he had been there.  The defense undeniably should have been

13  allowed to focus on the State's failure to perform forensic testing that possibly might have provided

14  relevant physical evidence.  However, if the trial court simply had allowed the questions to be asked,

15  there in truth is virtually nil chance that the trial would have ended any other way on that account, given

16  the relative strength of the evidence against Rankin.

17         The Court does not find that the error had substantial and injurious effect or influence in

18  determining the jury's verdict.

19         Ground 2 therefore does not provide a basis for federal habeas relief.  The Court will grant a

20  certificate of appealability on the claim, however, as jurists of reason could find the rejection of the

21  claim to be debatable.[58]

22  _____

23         [57]See text and record cites, *supra*, at 5 & 9-11.

24         [58]The grant of a COA does not signify that this Court is "in equipoise" on the issue.  The Court is confident that

25  it has reached the right result for the right reasons, and it is not left either with grave doubts or in equipoise.  The Court
    simply finds under the appropriate standard for a COA grant that jurists of reason could find the issue to be debatable.

26         In the federal reply, petitioner in the main argues that the error was not harmless because the trial court violated

27  Rankin's right to present his defense.  The existence of constitutional error does not *ipso facto* establish that the error
    was not harmless.  The Court simply notes in passing that petitioner's argument begs the question.  The Court has

28                                                                                                  (continued...)

***Ground 3(a): Effective Assistance – State's Alleged "Justify Your Verdict" Closing***

In Ground 3(a), petitioner alleges that he was denied effective assistance of trial counsel when counsel failed to object to alleged prosecutorial misconduct in closing argument by the State exhorting jurors allegedly to "justify their verdict" to other jurors if they did not believe the State's evidence.

As the prosecutor neared the end of the State's closing argument, he compared the witnesses' inability to state and/or recall certain specifics in their descriptions correctly to an individual not being able to correctly recall specific details regarding Da Vinci's *Mona Lisa*, such as the length of her hair or the color of her dress.  The prosecutor then continued:

> Can you correctly identify and recall with specificity and accurately each of those details?
>
> Whether you can or can't, but whether or not you're a hundred percent certain or not is there any doubt in your mind when you took a look at the Mona Lisa you can say with a hundred percent certainty I've seen that before.
>
> That's what each one of those witnesses tells you. "As I look at this man I had an opportunity to see his face and I recognized him.  I recognized him 100 percent."
>
> If you don't believe them justify to your fellow jurors why it is Jesus Lera isn't to be believed when he tells you he recognizes the man that did that to him.
>
> If you don't believe it justify it to your fellow jurors why it is that Mario Sangines is not to be believed when he says with a hundred percent certainty this is the man who did that to me.

---

[58](...continued)

analyzed the harmless error issue without assigning any burden of proof, production, and/or persuasion to petitioner. *See O'Neal, supra.*  The Court's decision is based on the record, not the argument of counsel.

Respondents, in turn, suggest that the crime scene analyst's testimony would have had to reveal exculpatory evidence for the error to not be harmless.  The Court expressly does not base its decision on such a premise.  Preventing defense counsel from focusing on the State's failure to pursue additional forensic testing in a substantially weaker case very well could have a substantial and injurious effect or influence on a jury's verdict in such a case.  See also n. 56, *supra.*  The trial error was not a *Brady* violation where material exculpatory evidence was withheld.  Rather, the error was not allowing the defense to challenge the extent of the State's investigation in seeking to cast doubt upon whether the State had performed a thorough enough investigation to establish the defendant's guilt beyond a reasonable doubt. The question of whether such an error was harmless error turns upon the strength of the evidence otherwise presented at trial, not upon whether the barred line of questioning would have elicited actually exculpatory testimony.  Otherwise, a failure to allow a defendant to pursue this line of defense – seeking responses that testing had not been done – inherently never would constitute harmless error because the responses by definition never would be exculpatory.  That is not how the *Brecht* analysis operates in this context.

1           If you don't believe it justify to your fellow jurors why it is that
2    Victor Sangines can do the same thing; come in here and tell you with
     one hundred percent assurance that's the man.

3         . . . . .

4           Further justify to your fellow jurors it is this than [why it is that
     this man then?] was found dirty, bleeding, panting and sweating
5    profusely within the perimeter that the police had established shortly
     after the crime.

6
            This case is about whether or not you believe, beyond a
7    reasonable doubt, this man was one of those two assailants. . . . .

8    #29, Ex. 33, at 71-73.[59]

9        The state supreme court rejected the claim presented to that court on the following grounds:

10         . . . [A]ppellant claimed that his trial counsel was ineffective for
     failing to object to prosecutorial misconduct during closing arguments.
11   Appellant claimed that the State improperly told the jurors to "justify"
     any lack of belief in the State's evidence to the other members of the
12   jury. Appellant failed to demonstrate that he was prejudiced. During
     closing arguments, the State asked that the jurors, if they did not believe
13   the three victims' testimony, to "justify it to your fellow jurors" why the
     three victims were not truthful. Appellant failed to demonstrate that
14   there was a reasonable probability of a different outcome given the
     substantial evidence of his guilt given the strong identifications of the
15   three victims. We further note that the jury was instructed that the
     statements, arguments, and opinions of counsel were not to be
16   considered as evidence and that the jury was properly instructed on the
     reasonable doubt standard. Therefore, the district court did not err in
17   denying this claim.

18   #30, Ex. 81, at 9-10.

19       The state supreme court's rejection of this claim was neither contrary to nor an unreasonable

20   application of clearly established federal law.

21       On a claim of ineffective assistance of counsel, a petitioner must satisfy the two-pronged test

22   of *Strickland v. Washington*, 466 U.S. 668 (1984). He must demonstrate that: (1) counsel's performance

23   fell below an objective standard of reasonableness; and (2) counsel's defective performance caused

24   actual prejudice. On the performance prong, the issue is not what counsel might have done differently

25   but rather is whether counsel's decisions were reasonable from his perspective at the time. The court

26   starts from a strong presumption that counsel's conduct fell within the wide range of reasonable conduct.

27   

28        [59]The prosecutor never used the specific phrase "justify your verdict."

1  On the prejudice prong, the petitioner must demonstrate a reasonable probability that, but for counsel's

2  unprofessional errors, the result of the proceeding would have been different. *E.g., Beardslee v.*

3  *Woodford*, 327 F.3d 799, 807-08 (9th Cir. 2003).

4      The state supreme court's holding – on the prejudice prong – that there was not a reasonable

5  probability of a different outcome at trial if there had been an objection was not an objectively

6  unreasonable application of *Strickland*.

7      Petitioner contends that the identification testimony could not fairly be said to have been strong.

8  As discussed as to Ground 2, this Court did not view the three identifications as having at least equally

9  substantial corroborating weight in assessing the harmless issue on a *de novo* application of the *Brecht*

10 standard.  However, on a deferential review under AEDPA of the state supreme court's determination

11 on the *Strickland* prejudice issue, fairminded jurists certainly could find the state supreme court's

12 reliance upon "the substantial evidence of . . . guilt given the strong identifications of the three victims"

13 to be objectively reasonable.  All three eyewitnesses in fact did positively identify Rankin when the

14 question was presented, and Victor Sangines' identification testimony was quite strong, as also

15 discussed as to Ground 2.  It was not objectively unreasonable for the state supreme court to regard the

16 three witnesses identifications as substantial evidence, notwithstanding the sundry arguments advanced

17 by petitioner seeking to question the reliability of the identification testimony.  That is, petitioner's

18 arguments do not necessarily render the identification testimony at petitioner's trial insubstantial.

19     Petitioner further urges that there was no explanation for why Rankin would be bleeding.  He

20 posits that the victim's statements[60] provide no explanation for his appearance because the statements

21 do not refer to any altercation in which Rankin would have been scratched.  The trial evidence clearly

22 reflected that Rankin had fresh cuts on both his neck and the palm of one hand.  Fresh cuts readily imply

23 bleeding.[61]  That is what the trial evidence reflected occurred as a matter of actual fact – explanations

24 therefor regardless.  Petitioner hardly can complain of material prejudice from a reference to facts

25  ───────────────

26      [60]The prejudice issue under *Strickland* turns upon what was in the *trial evidence*, not on what was in the victims' statements.  Petitioner was tried based on the trial testimony, not upon a packet of witness statements.

27

28      [61]See text, *supra*, at 10.  The initial custodial officer took Rankin – at his request – over to the emergency medical personnel back over at the robbery location first before transporting him to the jail. #29, Ex. 29, at 58-59.

-29-

actually in evidence.  Petitioner in any event overlooks the obvious permissible inference that petitioner sustained the cuts while running and hiding and/or trying to crawl through or over obstacles in a dark residential setting while trying to evade canine patrols searching the area.[62]  The jury, the state supreme court, and this Court have not been restricted to what may be within the four corners of witness statements that were not of record when instead considering the *trial evidence* and the potentially permissible inferences that could be drawn from that evidence.

Ground 3(a) does not provide a basis for federal habeas relief.[63]

***Ground 3(b): Effective Assistance – Reference to Rankin as the Shooter in the State's Rebuttal***

In Ground 3(b), petitioner alleges that he was denied effective assistance of trial counsel when counsel failed to object to alleged prosecutorial misconduct when the State argued in the rebuttal closing argument that Rankin was the gunman.

In the defense closing, counsel in the main challenged the identification testimony, maintaining that the State had failed to prove beyond a reasonable doubt that Rankin was one of the two robbers.  Toward the end of the closing, defense counsel directed additional argument specifically to the charge of attempted murder with use of a deadly weapon.  Counsel posited:

> . . . . Regardless of who was involved in this crime certainly the State has failed to prove, beyond a reasonable doubt, that particular charge of the information.
>
> Why do I say that?
>
> . . . . .
>
> What has the testimony shown?

---

[62]See text, *supra*, at 25-26.

[63]The Court notes in passing that the State's *Mona Lisa* analogy was off the mark.  Identifying a suspect as an offender typically involves identifying someone with whom one had not been previously familiar.  As the defense expert witness noted, "[a]ll of this [the factors concerning reliability of identifications] would be relatively meaningless if it's somebody you know." #29, Ex. 33, at 22.  Many people would be able to pick the *Mona Lisa* out of a lineup of portrait paintings because it is an image that – for one reason or another – they repeatedly have seen in popular culture over the course of a lifetime.  They know the image of the *Mona Lisa*.  Comparing the jurors' ability to recognize the well-known visage of the *Mona Lisa* to the witnesses' ability to recognize Rankin therefore was a flawed analogy.  The Court merely notes this point in passing.  No exhausted claim has been presented in this regard, and it further would not appear that a failure to raise such an in hindsight debating point would have given rise to prejudice under *Strickland*.

-30-

> The testimony has shown whoever shot this guy, *and nobody really knew or even could tell you who shot Jesus Lara*.  Whoever shot him had to be within two or three feet of him.

#29, Ex. 33, at 95 (emphasis added).

Defense counsel then presented argument maintaining that the fact that the shooter shot Lera only in the triceps at close range undercut any suggestion that the shooter intended to kill Lera.[64]

In the rebuttal argument, the State's co-counsel challenged the defense premise that the fact that Lera was hit in the arm was inconsistent with an intent to kill, given that Lera had been using his arms to shield his head from being shot.  She also referred to the second robber's statements to the other robber to "shoot him, shoot him."  She further argued, *inter alia*:

> We know the Defendant was the one on that side of the Car. [sic] Chances are it had to have been the Defendant who fired that shot.
>
> If you're unsure as to whether it was the Defendant who fired the shot, it doesn't matter.  You have got different theories of criminal liability.
>
> He's still equal [sic] responsible.

#29, Ex. 33, at 105-07.

The state supreme court rejected the claim presented to that court on the following grounds:

> . . . [A]ppellant claimed that his trial counsel was ineffective for failing to object when the State suggested that appellant was the gunman during the robbery. At trial, the evidence concerning the gunman was inconclusive; however during closing arguments the State made statements that appeared to suggest that appellant was the gunman. Appellant failed to demonstrate that he was prejudiced.  Appellant was charged as a coconspirator in the robbery, the evidence did not exclude him as the gunman, and the jury was instructed that the statements, arguments, and opinions of counsel were not to be considered as evidence.  Further, considering the substantial evidence of appellant's guilt, we conclude that the statements in closing arguments did not prejudice appellant. Therefore, the district court did not err in denying this claim.

#30, Ex. 81, at 10-11 (footnote quoting argument quoted herein omitted).

The state supreme court's rejection of the claim was not an objectively unreasonable application of the prejudice prong of *Strickland*.

---

[64]#29, Ex. 33, at 95-97.

-31-

1    Petitioner argues in the federal reply:

2           The State's theory of the case generally was that Rankin was the
        second suspect who was not the gunman.   (See Ex. 74 at 24-33.)
3       However, during the State's rebuttal in closing argument, the prosecutor
        argued that Rankin was the shooter.  (Ex. 33 at 102, 106.)
4    #49, at 14.

5         The Court must observe yet once again that the jury, the state supreme court, and this Court

6    consider the *trial evidence* when adjudicating issues in this case that turn upon what evidence was

7    presented at trial.  The exhibit that petitioner cites at Exhibit 74 is the *state post-conviction evidentiary*

8    *hearing transcript*.   What participants from the trial may or may not have said years later at an

9    evidentiary hearing does not establish whether a failure to object to a portion of a prosecutor's rebuttal

10   argument resulted in material prejudice under *Strickland* in light of the *trial evidence.*  Where alleged

11   prejudice based upon the trial record is at issue, again, the content of other materials – whether witness

12   statements not introduced in evidence at trial and/or hearing transcripts from years later – has no

13   relevance.

14        This Court has extensively reviewed the actual trial evidence.  Against the backdrop of the

15   actual trial evidence, a statement that "[c]hances are it had to have been the Defendant who fired that

16   shot" hardly was completely lacking in any record support.  Under much of the testimony, the second

17   robber, identified as Rankin, was on the same side of the car with Jesus Lera.  Under much of the

18   testimony, the second robber also potentially may have had a gun.  Under the testimony, it was not

19   conclusively established, even by Lera, that the first robber, rather than the second, shot Lera.[65]

20   Moreover, on the evidence at trial, petitioner faced potential culpability as a principal regardless.

21        The Court thus highly doubts that trial counsel rendered deficient performance in the first

22   instance in not objecting to the single sentence of prosecutorial rebuttal argument that forms the basis

23   of Ground 3(b).  The Court is abundantly certain, however, that, based on the evidence actually

24   presented at trial, the state supreme court's holding that there was no prejudice from any failure to

25   object was not an objectively unreasonable application of *Strickland*.

26        Ground 3(b) therefore does not provide a basis for federal habeas relief.

27

28        [65]See text, *supra*, at 2-7.

***Ground 3(c): Effective Assistance – Gunshot Residue and Blood Spatter Testing of Clothing***

In Ground 3(c), petitioner alleges that he was denied effective assistance of trial counsel when counsel did not have his clothing that had been secured by the police at his arrest tested for gunshot residue and/or blood spatter.

Relevant trial evidence is summarized in the text, *supra*, at 2-15; and the discussion of the related substantive claim in Ground 2 in the text at 18-26, *supra*, provides additional background.

On state post-conviction review, Rankin filed a *pro se* petition; and he, *inter alia*, moved for appointment of counsel. The state district court held an evidentiary hearing without appointing counsel.

The transcript of the evidentiary hearing suggests that Rankin came to the proceeding without an understanding that he then was being brought to court to present his case *pro se*:

> THE COURT: . . . . [The court first addressed petitioner by explaining procedures for questioning of witnesses.] So I don't want you to feel like if you don't ask a question just immediately, you've lost your opportunity; do you understand?
>
> THE DEFENDANT: Well, I had put in motions for --
>
> THE COURT: Did you understand what I just said?
>
> THE DEFENDANT: Yeah, I understand.
>
> THE COURT: Okay. You put in a motion for what?
>
> THE DEFENDANT: I put my petition for someone to represent me or something pertaining to the law. I really don't know how to prepare the writ and how to do my writ.
>
> THE COURT: Well, sir, you need to be prepared to argue. You made a motion to have an attorney assigned.
>
> THE DEFENDANT: I did.
>
> THE COURT: It was denied.
>
> THE DEFENDANT: I did not know that.
>
> THE COURT: What's that?
>
> THE DEFENDANT: I never gotten nothing back from them.

#30, Ex. 74, at 2-3.

The court ultimately determined, however, that the counsel motion in fact had not been calendared and ruled upon previously. The court heard the motion then, asking Rankin to argue it at

-33-

that time.  The court, *inter alia*, inquired of the State's counsel whether he knew of any legal issues that needed briefing or any particular explanation by an attorney.  Counsel for the State argued at length that the issues did not require appointment of counsel for petitioner.  In response to further questioning, Rankin acknowledged that he had obtained a copy of the trial transcript previously, but he did not have the transcript with him.  Counsel for the State offered to loan petitioner a copy for the proceeding that day.  The court denied the motion for appointment of counsel and proceeded forward immediately with the evidentiary hearing.  Petitioner was required to immediately present his case apparently with no prior knowledge that he was being brought to court that day to present his case *pro se* and further apparently with no legal file materials in hand other than a trial transcript loaned to him during the hearing.[66]

When the court thereafter reached the claim corresponding to federal Ground 3(c), a number of responses were made to the claim by the court, counsel for the State, and/or defense counsel.

First, the court and counsel posited that forensic testing of Rankin's clothing would have been irrelevant because he was not alleged to have been the shooter.  Rankin immediately pointed out that the State had argued in its rebuttal argument instead that he was the shooter.  Over the course of the remaining discussion of the claim, which covered a number of points, Rankin sought to find in the loaned transcript where the State had done so, also noting that some of the testimony suggested that he might be the shooter.  Counsel for the State ultimately found the pertinent portion of the rebuttal argument.  He indicated that they were "stuck" with the "stupid argument," but he disagreed with Rankin's statement that trial testimony suggested that he was a shooter.  After a discussion of a number of other points, the state district court moved to the next claim with Rankin still trying to find the supporting record references in the transcript copies loaned to him by the State at the hearing.[67]

The first potential basis for rejecting the claim identified at the state evidentiary hearing arguably begged the question.  This Court's summary of the trial proceedings herein and the discussion of Ground 3(b) reflects that the State expressly argued in the rebuttal: " Chances are it had to have been

---

[66]#30, Ex. 74, at 3-8.

[67]#30, Ex. 74, at 23-34.

the Defendant who fired that shot." Whether or not that was an intelligent argument, the argument was made by the State to the jury without the State ever disavowing the argument at trial.  Moreover, the Court's summary of the trial evidence clearly reflects evidence supporting an inference both: (a) that the robber identified as Rankin was or at least may have been a shooter; and (b) in all events, the second robber may have been close enough to the shot fired potentially to be subjected to gunshot residue and/or blood spatter.[68]

Second, the state court repeatedly suggested to Rankin that the absence of testing inured to his benefit because the lack of testing did not state anything one way or the other.  Rankin responded that identification was the issue at trial and negative test results would have helped him prove his innocence, supporting his claim that "I wasn't there, period."[69]

The second potential basis for rejecting the claim thus also appeared to beg the question.  If the test results in fact were to show no supporting physical evidence where such physical evidence at least potentially might be recovered if the subject were present, the results then would have provided circumstantial evidence in support of a defense claim of misidentification.

Third, defense counsel stated that challenging the absence of evidence sometimes could be as persuasive and that the defense would run a risk by testing the clothing because positive results would essentially eliminate any misidentification defense.  Counsel then discussed gunshot residue testing on Rankin's hands rather than his clothes.  Counsel stated that he was appointed six months into the case, after the public defender's office had a conflict, and Rankin's hands could not be tested at that point.[70]

Counsel's testimony in this regard led to the following exchange:

> THE DEFENDANT: Why hands?  You know it is not going to be on the hands.  Why don't you test my clothes?  I asked you in court.
>
> THE WITNESS: There is a problem if you are standing within close proximity to the shooter that blood spatter or gun residue will get on your clothes.  And if it's – –

---

[68]See text, *supra*, at 2-7 & n.16; 30-32.

[69]#30, Ex. 74, at 27-28.

[70]#30, Ex. 74, at 29-31.

THE DEFENDANT: And I told you that it is not – – .

THE COURT: Let him finish.  Are you finished?

MR. PERCIVAL [defense counsel/the witness]: I guess.

THE COURT: Go ahead.

THE DEFENDANT: I told you I was innocent.  Why wouldn't you test it?  I told you I was innocent.  I had nothing to do with this.  Why wouldn't you help me prove my innocence?

I asked you to get the clothes tested in court.  I've never seen you outside, so it was in court that I asked you.

THE COURT: Do you recall the request to have the test done?

MR. PERCIVAL: I do not.

THE DEFENDANT: Well, I have letters to the Public Defender that I wrote to her and asked her, so she passed that on to you.  You sent me my papers so you know that I had it.

MR. SIMON [for the State]: That's argumentative, Your Honor.

#30, Ex. 74, at 31-32.

The state district court thereupon reiterated that "I'm still somewhat at a loss to see what significance this would have," because the other robber was alleged to be the shooter.  The court moved to the next claim a short time thereafter with, as previously noted, Rankin still trying to find the references in the loaned trial transcript to the testimony suggesting that he was a shooter.[71]

The third potential basis for rejecting the claim also, in part, begged the question.  The inability to perform gunshot residue testing of Rankin's hands of course had nothing to do with the claim for failing to test the preserved clothing.  Moreover, whether the point allegedly was argumentative or not, while substitute counsel was not automatically required to investigate every avenue requested by the defendant, the defendant's alleged communications to original counsel could not be disregarded by substitute counsel simply because they were not made specifically to him.  Substitute defense counsel of course had no less obligation under the Sixth Amendment to investigate and contest the State's case coming into the case six months after it was commenced.

---

[71]#30, Ex. 74, at 32-34.

1    Respondents maintain that the state supreme court rejected the claim corresponding to federal

2    Ground 3(c) on the following basis:

3

4              . . . [A]ppellant claimed that his trial counsel was ineffective for
         failing to request that a paraffin test be conducted.  Appellant failed to
5        demonstrate that his trial counsel's performance was deficient.  At the
         evidentiary hearing, appellant's trial counsel testified that he did not
6        request a paraffin test because there was a long time period between
         appellant's arrest and his appointment as counsel; thus, he felt that a test
7        would not have revealed anything of value.  "Tactical decisions [of
         counsel]  are  virtually  unchallengeable  absent  extraordinary
8        circumstances"  and  appellant  failed  to  demonstrate  any  such
         circumstances here.  See Ford v. State, 105 Nev. 850, 853, 784 P.2d 951,
9        953 (1989).  Therefore, the district court did not err in denying this
         claim.

10   #30, Ex. 81, at 4; #48, at 18.

11   If that indeed was the basis for the rejection of the claim, then the state supreme court's decision

12   clearly was an objectively unreasonable application of *Strickland*.  The portion of the decision relied

13   upon by respondents did not simply decide one claim or facet of a claim while not explicitly addressing

14   another claim or facet of a claim.  The state supreme court in the above passage instead fundamentally

15   misapprehended the nature of the claim presented.  The claim was about testing of clothes, not hands.

16   The passage above begged the question just as did the evidentiary hearing testimony by defense counsel

17   that was relied upon by the state supreme court.[72]

18   The Court thus will consider Ground 3(c) *de novo* rather than on deferential AEDPA review.

19

20   [72]Moreover, petitioner was entitled to effective assistance counsel prior to the substitution of counsel.  The
21   issue was not replacement counsel's individual performance in isolation but instead was whether Rankin was denied
     effective assistance of counsel in the defense of his criminal case.  If original counsel *arguendo* provided deficient
22   performance by not securing testing of fungible evidence, it would be no valid answer to the claim that replacement
     counsel thereafter could not test the evidence because original defense counsel had let the opportunity to do so lapse.

23
     The state supreme court did address a claim that "trial counsel was ineffective for not objecting to prosecutorial
24   misconduct in failing to preserve exculpatory evidence" based upon an alleged failure by the State to conduct a paraffin
     test for gunpowder residue and to preserve his clothing." #30, Ex. 81, at 3-4.  However, this, again, in truth was not the
25   claim in question.  Rankin was contending – in his petition and in the very same the portion of the evidentiary hearing
     that the state supreme court referenced – that defense counsel failed to secure testing of clothing that had been preserved
26   not that counsel failed to object to a failure to preserve the clothing.  An ineffective-assistance claim based upon a
     defense failure to test evidence necessarily is premised upon the evidence being available to the defense for testing.

27
     Respondents in all events have not relied upon the passage discussed in this footnote as deciding the claim in
28   Ground 3(c).

-37-

1    On *de novo* review, the Supreme Court's decision in *Harrington v. Richter*, 131 S.Ct. 770

2  (2011), establishes three principles that in large measure direct the outcome as to the application of the

3  performance prong under *Strickland* in this case.

4    First, "[e]ven under *de novo* review, the standard for judging counsel's representation is a most

5  deferential one" under *Strickland*.   131 S.Ct. at 788.   That is, while consideration of counsel's

6  performance on AEDPA review may be "doubly deferential," the *Strickland* performance standard

7  nonetheless remains "highly deferential" on *de novo* review.  *Id.*

8    Second, "*Strickland* . . . calls for an inquiry into the objective reasonableness of counsel's

9  performance, not counsel's subjective state of mind." 131 S.Ct. at 790.  The reviewing court, however,

10 must reconstruct the circumstances existing at the time of counsel's challenged conduct and evaluate

11 the conduct from counsel's perspective at the time.  131 S.Ct. at 789.

12    Third, and most directly applicable to this action, defense counsel does not provide deficient

13 performance in failing to conduct forensic testing, even when requested by the defendant, where defense

14 counsel has reason to question his client's account.  As the Supreme Court observed in an analogous

15 setting in *Richter*:

16       Even if it had been apparent that expert blood testimony could
         support Richter's defense, it would be reasonable to conclude that a
17       competent attorney might elect not to use it.  The Court of Appeals
         opinion for the en banc majority rests in large part on a hypothesis that
18       reasonably could have been rejected. The hypothesis is that without
         jeopardizing Richter's defense, an expert could have testified that the
19       blood in Johnson's doorway could not have come from Johnson and
         could have come from Klein, thus suggesting that Richter's version of
20       the shooting was correct and Johnson's a fabrication. *This theory
         overlooks the fact that concentrating on the blood pool carried its own
21       serious risks. If serological analysis or other forensic evidence
         demonstrated that the blood came from Johnson alone, Richter's story
22       would be exposed as an invention. An attorney need not pursue an
         investigation that would be fruitless, much less one that might be
23       harmful to the defense. Strickland, supra, at 691, 104 S.Ct. 2052. Here
         Richter's attorney had reason to question the truth of his client's
24       account, given, for instance, Richter's initial denial of involvement and
         the subsequent production of Johnson's missing pistol.*

25

26                                    . . . . .

27       To support a defense argument that the prosecution has not
         proved its case it sometimes is better to try to cast pervasive suspicion
28       of doubt than to strive to prove a certainty that exonerates.  All that
         happened here is that counsel pursued a course that conformed to the

-38-

1            first option.  If this case presented a *de novo* review of *Strickland*, the
     foregoing might well suffice to reject the claim of inadequate counsel
2    . . . .

3    131 S.Ct. at 790 (emphasis added).

4          In the present case, defense counsel's evidentiary hearing testimony, although it digresses into

5    other points, suggests that counsel made a strategic decision to not figuratively "roll the dice" and

6    initiate forensic testing that might eliminate any realistically plausible claim of misidentification.[73]  The

7    hearing transcript further reflects Rankin's apparently passionate assertions that he was innocent and

8    his pleas that his clothing be tested, at least as made at the time of a hearing two years after the

9    conviction.  However, reconstructing the circumstances facing defense counsel prior to trial, it would

10   have been objectively reasonable for counsel to question whether the forensic evidence potentially could

11   be inculpatory despite petitioner's protestations of innocence.

12         In his initial statement to the police,[74] Rankin stated that he and a girlfriend had just been

13   dropped off in the alley, that he heard a commotion and for some unexplained reason walked toward

14   the commotion, that he saw a friend Kevin M_____ in a commotion with some "Mexicans," that he saw

15   the light from a gunshot apparently by Kevin, and that Rankin "walked," with the "Mexicans" saying

16   to him "Hey, you . . . now fucker" as he "walked."  To be sure, Rankin's account did not violate any

17   laws of physics.  And Rankin conceivably may have had an unwise but nonetheless honest propensity

18   to walk toward trouble not involving him rather than away from it, despite a criminal record that would

19   be problematic for him in any such circumstances.  However, defense counsel nonetheless had to

20   consider the not unrealistic prospect that Rankin's account simply was a weak and highly implausible

21   *post hoc* explanation for his being present at the scene and being recognized by the victims without

22   actually being the second robber with his friend Kevin.

23         Moreover, defense counsel further would have to consider Rankin's prior criminal record.  He

24   had been convicted of a 1994 armed robbery involving two armed assailants.  As reflected by  the

25   State's sentencing memorandum, Rankin then was an admitted member of the "State Street Crips;" and

27       [73]#30, Ex. 74, at 29-30 & 31.

28       [74]#28, Ex. 1.

1   at the time of the 1994 robbery he was wearing a ball cap with the initials NTG, for "Northtown

2   Gangster" along with his alias "Capone." Thereafter, he had violated parole on multiple occasions and

3   had been convicted of multiple drug possession charges, reflecting a possible motive for continued

4   criminal activity. He had other charges pending at the time of the proceedings in this criminal case.[75]

5   Neither Rankin's statement[76] nor of course his prior criminal history was in evidence before the

6   jury. Defense counsel did not have to ignore either, however, in making an appraisal of what potentially

7   might happen if he requested forensic testing of Rankin's clothes for gunshot residue and/or blood

8   spatter. As in *Richter*, based on the circumstances presented to counsel, he had an objectively

9   reasonable basis to question his client's account.[77]

10   The Court accordingly holds, on a *de novo* review, that petitioner cannot satisfy the deficient

11   performance prong of *Strickland* . That is the result required by *Richter*, even on a *de novo* review.

12   Given that petitioner cannot show deficient performance, the Court has no occasion to consider

13   prejudice, as both must be shown.[78]

14

15   [75]#29, Ex. 35, at 2-3.

16   [76]The recording of the statement had become unintelligible, and both the State and defense affirmed that they
17   would not be referring at trial to the statement or what was said during the statement. #29, Ex. 25, at 2-7. Consistent
18   with the Court's observation in the text, although the issue with the recording perhaps may have rendered the statement
    transcript inadmissible, defense counsel nonetheless did not have to ignore the transcript of the statement in assessing
    trial strategy and considering what might happen if he sought to develop the forensic evidence in question.

19   [77]*Richter* apparently leaves a defendant protesting his innocence and asking defense counsel to obtain forensic
20   testing to corroborate his claim with little recourse if defense counsel could have an objectively reasonable basis to
21   question his account. That is, in such a circumstance, defense counsel does not provide ineffective assistance by not
    complying with the request where it is conceivable that the testing could inculpate the defendant.

22   [78]The Court notes that the represented petitioner has not sought in this federal habeas proceeding to secure
23   forensic testing of his clothing, if still available. While *Pinholster* precludes consideration on federal habeas review of
    evidence that was not before the state courts, that bar applies only where the state court decision withstands review
24   under the deferential AEDPA standard. If the federal court instead considers the claim *de novo*, the *Pinholster* rule is
    inapplicable. As the matter stands now, the bare claim by habeas counsel that the test results would be exculpatory
25   would not establish prejudice on either deferential or *de novo* review. Petitioner of course has the burden of both proof
    and persuasion on post-conviction review.

26   The represented petitioner further has not sought to pursue additional relief following upon the decision in
27   *Martinez v. Ryan*, 132 S.Ct. 1309 (2012), regarding the ability to demonstrate cause and prejudice for a procedural
28   default where the petitioner was not represented by counsel in the state post-conviction proceedings. On the record

(continued...)

The Court accordingly will deny relief on Ground 3(c), but it will grant a certificate of appealability on the claim. Jurists of reason would find the rejection of the claim to be debatable.

### Ground 3(d): Effective Assistance – Failure to Secure Defendant's Attendance

In Ground 3(d), petitioner alleges that he was denied effective assistance of trial counsel when counsel did not ensure his presence at a discussion on the record but outside the presence of the jury of a jury note inquiring as to whether there was a lesser charge for attempted murder.

The Supreme Court of Nevada rejected the claim court on the following grounds:

> . . . [A]ppellant claimed that his trial counsel was ineffective for allowing a hearing to be conducted outside of his presence. A brief hearing concerning the inclusion of a jury instruction regarding a lesser included offense to the attempted murder charge was held without appellant's presence. Appellant failed to demonstrate that his trial counsel's performance was deficient or that he was prejudiced. At the evidentiary hearing, appellant's trial counsel testified that he did not believe that appellant needed to be there to discuss the lesser included offense instruction because he had already discussed the issue with appellant and appellant had decided not to request an instruction on a lesser included offense to attempted murder. Further, appellant was acquitted of the charge of attempted murder. Thus, appellant failed to demonstrate that his presence at the hearing would have had a reasonable probability of altering the outcome at trial. Therefore, the district court did not err in denying this claim.

#30, Ex. 81, at 9.

The rejection of this claim was not an objectively unreasonable application of *Strickland*.

As the state supreme court observed, petitioner was acquitted of attempted murder. Petitioner presents no specific argument that would tend to establish prejudice on this claim. Prejudice is not established simply on the basis that petitioner had a constitutional right to be present at every critical stage of the case. On a claim of ineffective of assistance, petitioner must demonstrate prejudice satisfying the *Strickland* standard. He provides no specific argument articulating why the state supreme court's application of the *Strickland* prejudice standard on this claim was objectively unreasonable.

Ground 3(d) therefore does not provide a basis for federal habeas relief.

---

[78](...continued)
presented, there is no exhausted, non-defaulted, and timely claim before the Court that trial counsel was ineffective for failing to develop defense witness testimony (such as a girlfriend and/or the friend that allegedly dropped Rankin off) corroborating the account in Rankin's statement as to how he innocently happened to be at the scene right as the robbery was occurring and Lera was shot.

1    ***Consideration of Possible Issuance of a Certificate of Appealability***

2      Under Rule 11 of the Rules Governing Section 2254 Cases, the Court must issue or deny a

3    certificate of appealability (COA) when it enters a final order adverse to a petitioner.  As to the claims

4    rejected by on the merits, under 28 U.S.C. § 2253(c), petitioner must make a "substantial showing of

5    the denial of a constitutional right" in order to obtain a certificate of appealability.  *Slack v. McDaniel*,

6    529 U.S. 473, 483-84 (2000); *Hiivala v. Wood*, 195 F.3d 1098, 1104 (9th Cir. 1999).  To satisfy this

7    standard, petitioner "must demonstrate that reasonable jurists would find the district court's assessment

8    of the constitutional claim debatable or wrong."  *Slack*, 529 U.S. at 484.

9      The Court will grant a certificate of appealability as to its rejection of Ground 2 and 3(c) on the

10   merits.  The Court remains of the view that its ruling on these grounds was correctly decided.  However,

11   the issues are sufficiently debatable by jurists of reason.

12     The Court will deny a COA as to its denial of Ground 1 (text, *supra*, at 16-18), Ground 3(a)

13   (text, *supra*, at 27-30), Ground 3(b)  (text, *supra*, at 30-32), and Ground 3(d) (text, *supra*, at 41).

14     IT THEREFORE IS ORDERED that all claims in the petition, as amended, are DENIED with

15   prejudice on the merits and that this action shall be DISMISSED with prejudice.

16     IT FURTHER IS ORDERED that a certificate of appealability is GRANTED IN PART and

17   DENIED IN PART, such that a certificate of appealability is GRANTED as to Grounds 2 and 3(c) but

18   is DENIED as to all other claims.

19     The Clerk shall enter final judgment accordingly in favor of respondents and against petitioner,

20   dismissing this action with prejudice.[79]

21     DATED this 21st day of March, 2014.

22

23

24                LARRY R. HICKS

25                UNITED STATES DISTRICT JUDGE

26

27     [79]Petitioner's request for an evidentiary hearing is denied, as review under AEDPA is restricted to the record
     presented to the state court that adjudicated the merits of the claims.  *See Pinholster*, 131 S.Ct. at 1398-1401.  Petitioner

28   otherwise has not presented a viable basis for an evidentiary hearing in this matter as to the claim considered on *de novo* review herein, as petitioner cannot establish deficient performance in the first instance on that claim, Ground 3(c).